UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RANDY L. MILLER, et al.,**

    **Plaintiffs,**

    v.

**RANDALL MEYER., et al.,**

    **Defendants.**

Case No. 2:14-cv-101
**JUDGE GREGORY L. FROST**
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant Jessica Little's ("Little") motion for summary judgment (ECF No. 56), Defendants Thomas Charles and Ronald Nichols' motion for summary judgment (ECF No. 57), Plaintiffs' combined response in opposition (ECF No. 63), Little's reply memorandum (ECF No. 68), and Charles and Nichols' reply memorandum (ECF No. 69). For the reasons that follow, the Court **GRANTS** the motions.

**I.**    **BACKGROUND**

The following background facts are set forth in a related case adjudicated by the Ohio Supreme Court. *See Ohio v. Graham*, 136 Ohio St. 3d 125, 991 N.E.2d 1116, 2013-Ohio-2114. These facts are undisputed in this litigation:

> At all relevant times, [Plaintiffs] were five upper-level employees of [Ohio Department of Natural Resources' ("ODNR")] Division of Wildlife ("DOW"): Division Chief David Graham, Assistant Chief Randy Miller, Human Resource Manager Michele Ward–Tackett, Law Enforcement Executive Administrator James Lehman, and District Manager Todd Haines.
>
> In September 2009, a confidential informant contacted the [Office of the Inspector General ("OIG")] to allege that Brown County DOW wildlife officer Allan Wright had engaged in misconduct . . . . According to the informant, Wright

1

assisted his nonresident friend, a South Carolina wildlife officer, in obtaining an Ohio-resident hunting license by allowing him to list Wright's home address as his own. This allowed Wright's friend to pay a resident license fee of $19 instead of the nonresident license fee of $125.

The OIG asked ODNR Director Sean Logan to investigate the alleged 2006 misconduct involving Wright and to prepare a report. The following month, Logan responded that the DOW had already completed an investigation in August 2008. Dissatisfied with the DOW investigation, the OIG assigned Deputy Inspector Ron Nichols to investigate. Nichols interviewed [Plaintiffs]—the DOW personnel involved in the Wright investigation—at different times between December 22, 2009, and February 1, 2010. . . .

During the interviews, [Plaintiffs] revealed that consistent with reciprocal practices in other states, prior practice within the DOW allowed wildlife officers from other states to obtain Ohio-resident hunting licenses as a way to encourage interstate networking and cooperation, although there are some discrepancies between the [Plaintiffs'] statements as to when the practice began and when it ended. In March and October 2008, appellant Graham issued memoranda reminding division employees about the need to purchase out-of-state licenses; the October memorandum expressly prohibited DOW employees from accepting free or discounted licenses in other states (even if those other states allowed it) and from permitting nonresident friends to obtain free or discounted licenses in Ohio.

[Plaintiffs] told Nichols that after learning that Wright had allowed an out-of-state wildlife officer to use Wright's home address, they had decided to handle Wright's misconduct administratively rather than report it to the ODNR director as a possible criminal violation. Collectively, [Plaintiffs] determined that Wright's misconduct fell into the ODNR disciplinary-guidelines category of "failure of good behavior" and decided that a verbal reprimand was the proper sanction.

During his questioning, Nichols asked each [Plaintiff] whether Wright's falsification of the license was a crime and why they, collectively, had decided not to pursue a criminal investigation. He asked several of the [Plaintiffs] how they could have disciplined Wright administratively for a 2006 violation of an internal prohibition that did not exist until Graham's 2008 memo. And he suggested to [Plaintiffs] Haines and Graham that perhaps [Plaintiffs] had decided to issue a verbal reprimand for this nonexistent violation under the catchall category of "failure of good behavior" because then Wright could not file a grievance over it and no one would ever know about it. Each [Plaintiff] testified at length, however, about the various factors that went into his or her decision-making, including the DOW's past practice of allowing nonresident wildlife

officers to obtain resident licenses, Wright's history and tenure at the ODNR, and Wright's use of his own home address, which indicated that he was not trying to hide anything.

In March 2010, the OIG issued an investigative report. The report concluded that Wright had committed wrongdoing by allowing an out-of-state wildlife officer to obtain an Ohio-resident hunting license using Wright's home address. Wright's excuse for doing so, according to the report, was that it was common practice in southwest Ohio to allow out-of-state wildlife officers to obtain resident licenses.

The report also concluded that [Plaintiffs] had improperly failed to report Wright's criminal conduct to the ODNR director or chief legal counsel, as required by the policies of the governor and the ODNR. The report stated that [Plaintiffs] had not verified whether Wright had been adhering to a common practice that his supervisors were aware of, as Wright claimed, and that [Plaintiffs] used the alleged practice as an "excuse to disregard the criminal violation." The OIG forwarded the report to the Brown County prosecuting attorney[, Jessica Little].

In April 2010, a Brown County grand jury indicted each [Plaintiff] on one count of obstructing justice and one count of complicity in obstructing justice, each a fifth-degree felony.

*Id*. ¶¶ 2–10.

After the indictments were issued, Plaintiffs moved to suppress the statements they made to Nichols. The trial court granted the request and stated that, if the statements were presented to the grand jury, then the case against Plaintiffs should be dismissed.[1] The appellate court reversed that decision, but the Ohio Supreme Court reinstated it and held that the statements should be suppressed. Little dismissed the case against Plaintiffs shortly thereafter.

Plaintiffs filed this lawsuit against several individuals and entities involved in the

---

[1] Plaintiffs' attempt to suggest that the trial court made this statement because Nichols gave false testimony to the grand jury, *see* ECF No. 63, at PAGEID #961, is misleading and not persuasive. The court's comments clearly refer to the issue of whether Plaintiffs' statements to Nichols should have been excluded from the grand jury, regardless of the truth or falsity of Nichols' characterization of Plaintiffs' statements. *See* ECF No. 63-11.

investigation and prosecution against them.  Plaintiffs alleged, *inter alia*, that Charles and Nichols manufactured evidence against them in compiling the investigative report, and that Little participated in manufacturing that evidence.  Plaintiffs further alleged that Charles and Nichols presented the false report to Little and encouraged her to prosecute them.  From those allegations, Plaintiffs brought a § 1983 claim alleging that Charles, Nichols, and Little violated Plaintiffs' Fourth Amendment right to be free from malicious prosecution.  Plaintiffs also brought a claim for conspiracy to violate their Fourth Amendment rights.

Plaintiffs also asserted various other claims against multiple defendants; however, the Court dismissed those claims in an Opinion and Order dated October 23, 2014.  Only "the limited portion of Plaintiffs' claim that Defendant Little manufactured evidence against them" and the "allegations that [Charles and Nichols] manufactured evidence in the OIG report and encouraged Defendant Little to prosecute Plaintiffs" remain in this litigation.  (ECF No. 42, at PAGEID # 274–75.)

Nichols, Charles, and Little now move for summary judgment on the remaining claims.  The Court will consider the parties' arguments below.

    **II.**    **DISCUSSION**

        **A.  Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.

*See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B. Defendant Little

Defendant Little's motion warrants its own analysis because prosecutors, unlike investigators, are entitled to absolute immunity in certain circumstances. The Court discussed this principle in its October 23, 2014 Opinion and Order:

> A prosecutor is entitled to absolute immunity from liability under § 1983 when he or she "acts within the scope of [his or her] duties in initiating and pursuing a criminal prosecution." *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011) (citing *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976)). To determine when a prosecutor is entitled to absolute immunity, courts look to "the nature of the function performed." *Id*. (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). If the prosecutor is performing an act of advocacy—such as "evaluating evidence, deciding to bring a criminal complaint and seek an arrest warrant, preparing a case for trial, and examining witnesses (even eliciting false testimony from those witnesses)"—then he or she is absolutely immune from suit, and a § 1983 claim cannot lie. [*Miller v. De. Cty. Comm'rs*, No. 2:13-cv-501, 2014 WL

5

> 457552, at *10 (S.D. Ohio Feb. 4, 2014)] (citing *Adams*, 656 F.3d at 401). In contrast, if a prosecutor is performing acts that are investigatory in nature, including "the preliminary gathering of evidence that may ripen into a prosecution," then absolute prosecutorial immunity does not apply. *Buckley*, 50 U.S. at 273.

(ECF No. 42, at PAGEID # 272–73.)

The Court further noted that Plaintiffs' allegations against Little survived the motion to dismiss because:

> [T]he Court must infer that Defendant Little met with OIG Defendants Charles and Nichols to discuss the investigation into Plaintiffs' activities. During that time—before (according to the Amended Complaint) the decision to prosecute was made—Defendants Little, Charles and Nichols allegedly manufactured evidence (namely, the OIG investigative report containing false information) and came up with false testimony that Defendant Little could use to prosecute Plaintiffs.

(ECF No. 42, at PAGEID # 273.)  The question at this stage is whether the evidence supports those allegations.

Little presented evidence in her motion for summary judgment that she made the decision to prosecute Plaintiffs before discussing the matter with anyone from the OIG.  Specifically, Little presented evidence that, in March of 2010, she received both Nichols' report and a letter from a third-party informant corroborating the report.  From that evidence, and before communicating with Charles and/or Nichols, Little made the decision to seek indictments against Plaintiffs.  Little also testified that she neither investigated Plaintiffs nor manufactured evidence against them.

This evidence, if undisputed, establishes that Little did not engage in the alleged misconduct and that, even if she did, her actions were within the scope of her "duties in initiating and pursuing a criminal prosecution." *Adams*, 656 F.3d at 401.  Absolute immunity therefore

6

applies unless Plaintiffs can "set forth specific facts showing that there is a genuine issue of material fact for trial."  *Muncie Power Prods., Inc.*, 328 F.3d at 873.

Plaintiffs fail to meet this burden.  Rather than identify specific evidence in response to Little's argument that absolute immunity applies, Plaintiffs offer only vague assertions that Little "was aware of the fabrication" in the report, "knew of the practice of other wildlife officers," and "knew evidence was fabricated and set out to find corroboration."  (ECF No. 63 at PAGEID # 964.)  These unsupported assertions do not create a material question of fact.

Plaintiffs also argue that Little interviewed other witnesses, all of whom "had information that contradicted her report," (ECF No. 63, at PAGEID # 964), but ignored that evidence and decided not to present it to the grand jury.  But Little's evaluation of evidence and her decision whether to present that evidence to a grand jury falls squarely within the scope of her prosecutorial duties.  That Little interviewed other witnesses and decided not to present those witnesses to the grand jury, even if true, does not defeat absolute immunity.

The Court concludes that Little is absolutely immune from liability for any of the alleged misconduct.  The Court accordingly **GRANTS** Little's motion for summary judgment.

### C.  Defendant Charles

Plaintiffs curiously continue to pursue this case against Charles, yet do not include any evidence against him in their brief.  In fact, the only references to Charles in Plaintiffs' brief involve a general policy that Charles announced prior to the investigation, the fact that Charles has a law enforcement background, and statements about Charles' alleged lack of truthfulness.

In his motion, Charles argues that the record is devoid of evidence that he played any role in Plaintiffs' investigation and/or prosecution.  Plaintiffs do not refute that assertion or attempt to

identify any evidence that would implicate Charles.  The Court accordingly **GRANTS** Charles' motion for summary judgment.

### D.  Defendant Nichols

The crux of Plaintiffs' argument is directed at Nichols.  As stated above, the only remaining allegation against Nichols is that he "manufactured a false investigative report and participated in a malicious prosecution based on that report."  (ECF No. 42, at PAGEID # 275–76.)  The "false investigative report" is crucial: without demonstrating that the report is false, Plaintiffs cannot establish that the prosecution against them lacked probable cause.

Nichols argues that the record is devoid of any evidence that the investigative report is false.  Plaintiffs respond by pointing out several areas of Nichols' report that purportedly contain false statements.  Presumably, although not clearly articulated, Plaintiffs are arguing that a material question of fact exists as to whether Nichols knowingly made those false statements such that he manufactured probable cause where none existed.

The Court agrees with Nichols that Plaintiffs fail to establish that any portion of the report is false.  At most, Plaintiffs provided evidence that gives additional context to Nichols' statements and would be relevant in mounting a defense to those statements.  The evidence does not, however, contradict the statements in Nichols' report or otherwise establish that those statements are false.  The evidence therefore does not establish a lack of probable cause.

For example, Plaintiffs argue that Nichols "lied" in his report about the number of complaints the confidential informant made to the OIG.  According to Plaintiffs, although the report states that the informant complained about "criminal activity by [DOW] Officer Allan Wright *and the failure of the Division to investigate the matter*," (ECF No. 57-6, at PAGEID#

8

685 (emphasis added)), Nichols testified in other contexts that the informant complained only about Wright. Plaintiffs do not provide the actual complaint from the informant but instead rely on other instances in which Nichols testified about the informant's complaint.

This argument is weak at best. In addition to being immaterial, the testimony Plaintiffs cite does not contradict Nichols' statement in the report. That testimony references the Wright complaint and the "license issue," (ECF No. 65, at PAGEID # 1365), but does not purport to limit the scope of the informant's complaint or address the comment about the DOW's alleged failure to investigate. That testimony therefore does not reveal a false statement in the report.

Plaintiffs also highlight Nichols' statement in the report that "[n]o one from [DOW] ever verified Wright's claims that the practice [in which he engaged] was widespread. In fact, we found that this claim is not true." (ECF No. 57-6, at PAGEID # 685.) The latter statement refers to a query of ODNR records that Nichols performed to determine whether "any other Wildlife officer's home address [was] being used by others." (*Id*. at PAGEID # 693.) Nichols' search revealed that "other [DOW] officers are not making a common practice of allowing nonresidents to use officers' addresses to obtain a resident hunting license." (*Id*. at PAGEID # 693.) This finding was important to Nichols because it suggested that Plaintiffs' rationale for not treating Wright's conduct as criminal was an "unsubstantiated . . . excuse" that they used to "disregard the criminal violation." (*Id*. at PAGEID # 693; 695.)

Plaintiffs assert that Nichols' statements are false because, during their interviews, Plaintiffs Haines and Graham identified three other individuals who had engaged in a similar practice as Wright by "providing an in-state address to allow an out of state Wildlife Officer to obtain a resident license." (ECF No. 63, at PAGEID # 956.) Plaintiffs suggest that these

9

identifications contradict Nichols' statement that no one from DOW verified Wright's claims that the practice was widespread.  Plaintiffs also argue that, in their interviews, they informed Nichols that they had witnessed "reciprocity shown to other out of state officers."  (ECF No. 63, at PAGEID # 956), which is further proof that Nichols' statement in his report is false.

      The Court disagrees.  The fact that DOW previously allowed its officers to show reciprocity to officers in other states does not mean that DOW officers engaged in the same misconduct Wright committed.  Indeed, Plaintiff Graham stated in his interview that past practice simply allowed administrators to provide complimentary licenses to officers in other states.  (ECF No. 57-11, at PAGEID # 851–52.)  That fact does not contradict Nichols' statement in his report that Plaintiffs did not verify Wright's story that the practice in which he engaged (falsifying official documents after the administrative practice ended) was widespread.

      The same is true regarding Plaintiffs' observations that three other individuals had committed similar misconduct as Wright.  Nichols searched 308,592 records involving 155 DOW officers to determine whether the practice in which Wright engaged was widespread; the fact that Plaintiffs identified three other individuals who had engaged in similar misconduct does not mean that it was.  Moreover, Nichols explained in the report that he searched for other instances in which officers used their own addresses on out-of-state hunting applications, and found none.  That three other officers improperly used "an in-state address," (ECF No. 63, at PAGEID # 956), does not contradict Nichols' finding.

      Plaintiffs next assert that Nichols' report is flawed because it omits reference to an interview Little conducted with South Carolina Wildlife Officer Eric Vaughn in which Vaughn stated that other South Carolina officers had obtained resident licenses using Ohio addresses.

But Vaughn's statement, even if true, says nothing of Plaintiffs' actions in investigating the issue and therefore does not contradict Nichols' finding. Plaintiffs' related argument that Nichols falsely testified that he did not interview Vaughn, when in fact he recorded the interview between Little and Vaughn, is immaterial to Nichols' findings in the report.

Finally, Plaintiffs highlight Nichols' statement in his report that "[n]one of the [Plaintiffs] reported Wright's alleged violation to the ODNR Director or his designee and Law Enforcement Administrator Mike Taylor, as required by ODNR policy and the Governor's policy." (ECF No. 57-6, at PAGEID # 696.) At least two pieces of evidence support that statement. First, Mike Taylor told Nichols in his interview that he did not know about the Wright incident until the OIG's investigation into the matter years later. *See* ECF No. 57-12, at PAGEID # 876. And second, Plaintiff Graham stated in his interview that neither he nor anyone else consulted with legal personnel or anyone at ODNR when the decision to handle the Wright incident as an administrative violation was made. *See* ECF No. 856, at PAGEID # 856.

In arguing that Nichols' statement in his report is false, Plaintiffs cite the interview testimony of Plaintiff Lehman, who stated: "I mean I know we had to have talked to Mike and discussed the issues." (ECF No. 56-22, at PAGEID # 582.) But Plaintiffs ignore the context of Lehman's statement. Lehman stated that he was not sure who made the decision to handle the Wright incident as an administrative matter, that "it would have . . . went to probably Mike Taylor," that consulting with legal personnel about possible criminal charges "would have been Mike's probably job [sic] to do that and I'm sure he did that," and that he couldn't remember how the decision to handle the Wright matter administratively was made. (*Id.* at PAGEID #

11

580–82.) Viewed in context, Lehman's statement that "we had to have talked to Mike"[2] reflects his uncertainty of the facts that occurred. It does not prove or disprove anything. This evidence therefore does not reveal that Nichols' statement in the report is false.

Plaintiffs also suggest that Nichols' statement is false because Plaintiffs informed ODNR's Deputy Director (Anthony Celebrezze) of the Wright incident, and because a later investigation suggested that ODNR Director Logan was aware of the incident in 2008. But these facts, even if true, do not contradict Nichols' finding that Plaintiffs failed to report the incident to Logan or Taylor. And even if Logan knew of the incident, Plaintiffs do not argue that this fact was communicated to Nichols during his investigation. This evidence therefore cannot create a question of fact as to whether Nichols knowingly made false statements in his report.[3]

In short, although the evidence Plaintiffs cite may provide context to some of Nichols' statements, it does not disprove those statements thereby demonstrating a lack of probable cause. Plaintiffs fail to meet their burden in identifying material questions of fact. The Court need not reach the parties' remaining arguments about whether Plaintiffs were deprived of their liberty and/or whether Little's dismissal of the charges against Plaintiffs was voluntary.

Having found that summary judgment is warranted on the malicious prosecution claim, the Court similarly finds that summary judgment is warranted on the conspiracy to commit

---

[2] Plaintiffs again mischaracterize the record by misquoting Plaintiff's Lehman's statement in his interview. Plaintiffs assert that Lehman said, "I know we talked to Mike," (ECF No. 63, at PAGEID # 957), presumably as an attempt to create conclusive evidence that Plaintiffs followed ODNR policy. But in fact Lehman said, "I know we had to have talked to Mike," (ECF No. 56-22, at PAGEID # 582), thereby revealing his uncertainty as to what actually happened.

[3] Plaintiffs also argue that, "[t]o add further fabrication to the report, Nichols indicated that the ODNR Director Sean Logan had no knowledge of the Allan Wright matter," (ECF No. 63, at PAGEID # 958), but do not cite this reference or identify the portion of the report to which they are referring. It is unclear to the Court whether Nichols did, in fact, make such an indication.

malicious prosecution claim.  The Court **GRANTS** Nichols' motion for summary judgment.

### III.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motions for summary judgment.  (ECF Nos. 56 & 57.)  The Clerk is **DIRECTED** to enter judgment accordingly and remove this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

>**/s/ Gregory L. Frost**
>**GREGORY L. FROST**
>**UNITED STATES DISTRICT JUDGE**